

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

December 9, 1958

Hon. William A. Harrison
Commissioner of Insurance
International Life Building
Austin 14, Texas

Opinion No. WW-533

Re: Certain questions con-
cerning reinsurance by
companies subject to the
fire insurance rating
laws reinsuring fire in-
surance policies issued
by companies which are
not subject to such rat-
ing laws.

Dear Sir:

Your amended request for an opinion given in lieu
of your letter of May 5, 1958, is as follows:

"Most companies writing fire and casualty insurance
in Texas are subject to the provisions of Sub-chapter C
of Chapter 5 of the Texas Insurance Code which author-
izes the State Board of Insurance to fix and promulgate
fire insurance rates. However, reciprocals, Lloyds and
county mutual insurance companies need not conform to
the fire insurance rates promulgated by the Board. It
has come to the attention of the Board that a number of
stock and mutual insurance companies which are subject
to the rating laws are reinsuring 100% of the fire in-
surance coverages written by companies which are not sub-
ject to these rating laws. Policies of fire insurance
purportedly are issued by a Lloyds or reciprocal or
county mutual (which will hereinafter be referred to as
exempt companies) at rates fixed by such exempt company,
without respect to the rates promulgated by the Board.
At the inception the coverage is reinsured 100% by the
stock or mutual company which could not otherwise issue
policies at the rates used in the issuance of such
policies.

"We respectfully request your opinion on certain
questions pertaining to the following facts:

"An exempt company has entered into a reinsurance
contract with a non-exempt company. Such agreement is
in substance that the exempt company has agreed to cede

to the non-exempt company all the premiums written by the exempt company on certain fire insurance coverages and in turn the non-exempt company has agreed to reinsure 100% of the liability of the exempt company. The only return to the exempt company is a small ceding commission. The non-exempt or reinsuring company has agreed to bear all of the expenses of servicing the business, paying the agent's commissions and has even been delegated the authority to appoint agents to act for the exempt company in connection with the sale of the particular insurance in question. The non-exempt company assumes full responsibility to investigate, settle and defend all claims arising under the policy. The purpose of this arrangement is to permit the non-exempt company to obtain the business at rates lower than that which they are permitted to write under the applicable rates promulgated by the State Board of Insurance. It is  standard procedure for the policy of the exempt company to have on its face or by endorsement language to the effect that the obligations under the policy are reinsured 100% by the non-exempt company. As a matter of practice the insured in settlement of any loss deals directly with the non-exempt reinsuring company. In many instances the policyholders are unwilling to accept the insurance of the exempt company until they have been furnished absolute evidence that the policy will be reinsured 100% by the non-exempt company.

"With respect to the above outline fact situation we ask the following questions:

"(1)  Must the rate of premium charged the policyholder conform to the standard premium promulgated by the State Board of Insurance for the particular risk covered under the provisions of Sub-chapter C of Chapter 5 of the Texas Insurance Code of 1951 as amended?

"(2)  Is the non-exempt 'reinsuring' company required to pay the gross premium receipts tax levied by Article 7064, R.S., 1925?"

The specific statutory authority for fixing of rates of fire insurance premiums is contained in Article 5.26 of the Texas Insurance Code as amended, Acts 1957, 55th Leg., p. 1443, ch. 497. Section (h) specifically exempts from the operation of Article 5.26 "County Mutual Insurance Companies operating under Chapter 17 of this Code; Underwriters at a Lloyd's operating under Chapter 18 of this Code; Reciprocals and inter-insurance exchanges operating under Chapter 19 of this Code". Sub-chapter C of Chapter 5 of the Texas Insurance

Code generally governs the power of the State Board of Insurance to promulgate and fix rates of fire insurance premiums charged on policies of fire insurance and allied lines issued in the State of Texas.

Article 5.26 as amended in 1957 requires the State Board of Insurance to promulgate maximum rates of insurance for fire risks.  Insurance companies subject to the law must charge the rates fixed by the Board unless permission is granted by the Board to deviate.

Initially, it is our opinion that the Legislature did not intend for the State Board of Insurance to promulgate maximum rates for "reinsurance" premiums.

"Reinsurance" is a contract whereby one for a consideration agrees to indemnify another, either in whole or in part, against loss or liability, the risk of which the latter has assumed under a separate and distinct contract as insurer of a third party.  8 Couch Cyclopedia of Insurance Law, p. 7389, Sec. 2256; 24-D Tex. Jur. 980, Sec. 484.

Of course, reinsurance is a form of insurance.  However, we believe the Legislature in Sub-chapter C of Chapter 5 of the Texas Insurance Code has recognized a distinction between "insuring" and "reinsuring".  In Article 5.41, Texas Insurance Code, it is provided:

"No company shall engage or participate in the insuring or reinsuring of any property in this State against loss or damage by fire except in compliance with the terms and provisions of this law; nor shall any such company knowingly write insurance at any lesser rate than the rates herein provided for, . . ."

The first clause expressly recognizes the distinction between "insurance" and "reinsurance" and then the next clause describes what is prohibited, that is, the company is prohibited from "knowingly writing insurance at any lesser rate".

See also the first sentence of Article 5.42 indicating the intent of the Legislature to only regulate relations between a company and its policyholders rather than relations between companies.  Again, the following language from Article 5.27, ".....(I)t being intended that every contract or policy of insurance against the hazard of fire shall be issued in accordance with the terms and provisions of this subchapter, . . ..."  is indicative of an intent to exclude reinsurance.  In a true contract of reinsurance the reinsuring company does not issue a "contract or policy of insurance against the hazard of fire".  The reinsurance contract insures the policy issuing company against loss by reason

of having issued contracts or policies of insurance.

Again, this conclusion is reinforced by the language of the emergency clause of the original Act permitting the Board to set maximum rates of fire insurance. Section 31 of the Act, 1913, p. 195, is as follows:

"The fact that there is now no sufficient law in this State prohibiting unjust discrimination in the collection of fire insurance rates as between citizens of the State; nor protecting citizens in securing reasonable rates, constitutes an emergency . . . . ."

We are not unaware of previous Attorney General opinions rendered on the same or similar questions. By opinion dated June 25, 1924 (Vol. 267, p. 267) the then Attorney General rendered an opinion to the State Fire Insurance Commission that properly licensed stock fire insurance companies which undertook to reinsure risks which were insured by companies not subject to the rating law were obliged to observe the rates for such risks which had been established by the Commission. A year later by opinion dated August 4, 1925 (Book 274, p. 901) the Attorney General advised the Fire Insurance Commission that the writing of reinsurance was not covered by the fire rating law. There is no discussion in this opinion of the previous opinion of June 25, 1924. Then by opinion dated September 29, 1930 (Book 316, p. 903) the Attorney General advised the State Fire Insurance Commissioner in effect that reinsurance was within the rating provisions of the statute.

You have orally advised me that in spite of these opinions it has been the consistent departmental interpretation that reinsurance in general was not subject to the rates promulgated by the State Board of Insurance and the predecessor Board of Insurance Commissioners. We do not believe that the statutes in question are ambiguous, but rather that they clearly exclude from their terms reinsurance, and the two earlier opinions to the contrary are clearly in error.

However, your letter suggests transactions which do not fall within the usual purview of reinsurance and though we have held that reinsurance as such does not come within the provisions of the fire insurance rate laws, the law does not prevent an inquiry beyond the form of a transaction into its true substance. We hold that under the fact situation given that the transaction in question is not one of reinsurance insofar as the rating laws are concerned. We further hold in response to your first question that the so-called reinsuring company has issued a policy of direct insurance.

Hon. William A. Harrison, page 5 (WW-533)


The premium charged the policy holder must conform to the rates which the reinsuring company is permitted to use under the provisions of Sub-chapter C of Chapter 5 of the Insurance Code.

What then is the primary test to determine whether or not a given transaction, regardless of the verbiage used, comes within the provisions of Sub-chapter C of Chapter 5? We believe that the statute applies when an insurance company enters into a contract to directly insure the hazards of fire and its allied lines. In support of this conclusion is the language of Article 5.27 previously quoted stating the intent of the Legislature:

"It being intended that every contract or policy of insurance against the hazard of fire shall be issued in accordance with the terms and provisions of this sub-chapter."

The primary test then as to whether or not the so-called reinsurance described by your request must conform to the rating provisions of Chapter C is whether or not under the terms of such so-called reinsurance contract the original insured has the right to proceed against the so-called reinsuring company if he should suffer a loss from the hazards of fire. If the original policyholder has a right to proceed directly against the "reinsurer", there is nothing which distinguishes the obligation of the so-called reinsurer from that which he would undertake should he issue directly a policy on the risk in question---the "reinsurer" has contracted to indemnify against the hazard of fire.

We do not intend to hold that every contract which gives the original policyholder a right to proceed against the so-called reinsurer must conform to the provisions of Sub-chapter C.

It is not unusual for the original insuring company and the reinsuring company to arrange conventional reinsurance in such a manner that the reinsurer assumes direct responsibilities to the policyholder. Here again we look to the purpose for which the Act was passed. As evidenced by the emergency clause the original fire insurance rating law was enacted to prevent discrimination between policyholders. That purpose is served when each policyholder similarly situated obtaining direct coverage from a non-exempt insurance company is able to obtain such coverage at the same rate of premium. A policyholder who has obtained his policies of insurance direct from a non-exempt company is not discriminated against as between himself and another who originally

obtains a policy from an exempt company at a lower rate of premium and then later, independent of the original negotiations, the same non-exempt insurance company assumes all or part of the liability of the exempt company on that particular policy. The second policyholder in the purchase or acquisition of his policy obtained no advantage of price or premium to which he was not properly entitled. The latter policyholder bargained for and acquired indemnity in the exempt company only. But where the policyholder obtains a policy from an exempt company which at its inception contains provisions which allow him to proceed directly against the non-exempt company, he has bargained for and obtained indemnity from the non-exempt company at a lesser rate than a policyholder who obtains a direct policy from the non-exempt company, thereby creating the discrimination intended to be eliminated by the law.

We would point out that the determination whether the transaction constituted "reinsurance" as opposed to "direct insurance" is largely a factual one dependent on assessment of the intent of the parties. That factual determination is primarily your responsibility.

Your second question is whether the reinsuring company is required to pay the gross premium receipts tax levied by Article 7064.

Article 7064 exacts a tax on the gross amount of premiums received on certain lines of insurance including fire insurance. However, expressly exempted from the provisions of Article 7064 are "premiums received from other licensed companies for reinsurance". We are not here concerned with the substantial question of whether or not reciprocal exchanges come under the terms of Article 7064. Article 7064 requires the insurance company subject thereto to report to the Board the "gross amount of premiums" received on property which is further defined:

". . . (t)he gross premium receipts where referred to in this law shall be the total gross amount of premiums received on each and every kind of insurance or risk written, except premiums received from other licensed companies for reinsurance, less return premiums and dividends paid policyholders, but there shall be no deduction for premiums paid for reinsurance."

We have held under the fact situation that the obligation of the so-called reinsuring company was in fact a direct obligation of the reinsuring company rather than one of reinsurance. Thus, we believe that the exemption in Article 7064 "reinsurance" would not be applicable. Under the fact situation and with the above conclusions, the so-called ceding

company would be collecting the premium both for itself and for the so-called reinsuring company and in this sense the gross premium on the policy would have been received both for itself and for the so-called reinsuring company. Assuming that the ceding company was a type of company subject to the tax under Article 7064, then both the assuming and ceding company would be jointly and severally liable for the premium tax under Article 7064. If the ceding company be exempt under the terms of Article 7064 from such a premium tax, then only the so-called reinsuring company would be liable for the tax.

We reached the above conclusion in view of the fact that under the circumstances given each of the two companies involved assumes 100% of the liability provided in the policy. The insured could elect to proceed either against the so-called ceding company or against the reinsuring company independently or could proceed against them jointly in one suit. Thus, each of the companies has assumed a joint and several liability under the terms of the contract. Hence, each would be jointly and severally liable for the taxes on the premium.

## SUMMARY

Under fact situation given, where fire insurance policy of a company exempt from fire insurance rating law is reinsured 100% by a company subject to this law:

(1) The premium charged the policyholder must conform to the rates which the reinsuring company is permitted to use under the rating law.

(2) And both companies are subject to the premium tax levied by Article 7064 unless exempted.

FBW:lm:wc
APPROVED:
OPINION COMMITTEE:
Geo. P. Blackburn, Chairman
W.E. Allen
Marietta McGregor Payne
REVIEWED FOR THE ATTORNEY
GENERAL BY:
W. V. Geppert

Very truly yours,

WILL WILSON
Attorney General of Texas

By s/Fred B. Werkenthin
    Fred B. Werkenthin
    Assistant